**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

TICOR TITLE INS. CO.,

    Plaintiff,

v.                                              Case No. 05-CV-73709-DT

NATIONAL ABSTRACT AGENCY, INC.,
EDWARD HARRIS and CITY TITLE
AGENCY, INC.,

    Defendants,

and

CITY TITLE AGENCY, INC.,

    Cross-Claimant,

v.

NATIONAL ABSTRACT AGENCY, INC.
and EDWARD HARRIS,

    Cross-Defendants,

and

NATIONAL ABSTRACT AGENCY, INC.
and EDWARD HARRIS,

    Cross-Claimants,

v.

CITY TITLE AGENCY, INC.,

    Cross-Defendant.
_____/

**FINDINGS OF FACTS, CONCLUSIONS OF LAW AND
APPLICATION OF FACTS TO THE LAW
AND NOTICE OF TELEPHONE CONFERENCE**

The matter is before the court for a determination pursuant to Federal Rule of Civil Procedure 52(a) on Plaintiff Ticor Title Insurance Company's ("Ticor's") breach of fiduciary duty claim against Defendants National Abstract Agency, Inc. ("National") and Defendant Edward Harris.[1]

## I.  INTRODUCTION

This action arises from Harris and National's improper transfer of $275,000 that had been entrusted by Ticor to National into the escrow account of Defendant City Title Agency, Inc. ("City Title").  On September 13, 2007, the court entered an opinion and order which, among other things, granted Ticor's "Motion for Partial Summary Judgment," filed on June 29, 2007.  As detailed in that order, the court determined that (1) Defendant National and Harris breached the issuing agency contract that they entered into with Ticor by Harris's improper transfer of $275,000 in escrow funds from National's escrow account into Defendant City Title's account, (2) pursuant to the personal guarantee signed by Harris, Harris is personally liable to Ticor for the debts

---

[1]Federal Rule of Civil Procedure 52(a) provides:

In an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately. The findings and conclusions may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision filed by the court. Judgment must be entered under Rule 58.

Fed. R. Civ. P. 52(a).  The court will not enter a judgment on this count, however, until the close of the entire case, inasmuch as it is possible that certain set-offs may be made between the parties on their competing claims.

and obligations of National and (3) City Title was unjustly enriched by Ticor when Harris improperly transferred $275,000 into City Title's escrow account. (*See* 9/13/07 Order.)[2] Ticor's motion did not raise, and the court did not otherwise address, Ticor's breach of fiduciary duty claim against National and Harris.

The parties[3] appeared for a limited bench trial on Friday, January 11, 2008, and testimony was given by two witnesses: Ticor employee Ethan Powsner and Defendant Harris. Having reviewed the applicable law and relevant facts, the court will award judgment in favor of Ticor and against National and Harris on this count.

## II. FINDINGS OF FACT[4]

1. Ticor is in the business of providing title insurance services of the kind routinely utilized in real estate transactions. To provide such services, Ticor contracts with title insurance agencies, like National, to issue insurance policies approved by Ticor. (9/13/07 Order at 3.)

2. On May 17, 2005, Ticor and National entered into an Issuing Agency Contract (the "Contract"), in which National was appointed to act as Ticor's agent in issuing title insurance commitments, policies, endorsements and other title assurances approved by Ticor. (*Id.*)

---

[2] The court made other findings in the September 13, 2007 order, including the finding that National and Harris were entitled to summary judgment on their unjust enrichment claim against City Title. (9/13/07 Order at 26.)

[3] Ticor does not assert this claim against Defendant City Title, and City Title therefore did not participate in the bench trial.

[4] The court detailed certain undisputed facts in its September 13, 2007 order. Where relevant, those facts are specifically incorporated by reference and with citation into this order as additional findings of fact.

3. The Contract governs the relationship between Ticor and National and provides that National is appointed as Ticor's agent "as a policy issuing agent of Principal for the sole purpose of issuing title insurance commitments, policies, endorsements and other title assurances approved by Principal . . ." (Contract at ¶ 1.)

4. The Contract enumerates the duties of National, which include, "[i]n those instances where Agent closes real estate transactions and receives and disburses funds of others," National must maintain the funds separately, reconcile the accounts to the bank statement and "disburse such funds only for the purposes for which they were entrusted." (*Id.* at ¶ 4(G).)

5. National was required to maintain an escrow ledger for each title insurance order involving fiduciary funds. (*Id.* ¶ 4(G)(iv).)

6. National was also required to maintain a control account showing total fiduciary liability for each escrow bank account. (*Id.* ¶ 4(G)(v).)

7. In the section entitled "Duties of Agent," the Contract states that National is not an agent of Ticor for purposes of conducting a closing, but does provide that "because Principal may be subject to allegations of liability for acts of Agent with regard to Agent's settlement or escrow business, Agent shall cooperate with Principal in the performance of audits of Agent's escrow records, accounts and procedures." (*Id.* at ¶ 4(J).)

8. The Contract also imposes a limitation on National's authority, prohibiting National to conduct closings, which means the "handling and disbursement of settlement funds or the providing of settlement services." (*Id.* at ¶ 7(H).)

9. However, the Contract provides that National shall be liable to Ticor for damages resulting from any improper closings or attempted closings by National, including the loss or misapplication of customer funds, failure to properly disburse funds, or misappropriation of escrow or closing funds. (Contract at ¶ 8(E).)

10. Harris, who is National's president and sole owner and who testified at the January 11, 2007 bench trial, signed the contract on behalf of National and signed a personal guarantee for National's obligations. (9/13/07 Order 3.) Harris reviewed and understood the Contract prior to signing it.

11. Before National began its operations in June 2005, Harris was involved with the operations of another title insurance agency, City Title. (*Id.*) City Title was formed in January 2005 by Victor Fuciarelli, who became its vice-president. (*Id.*)

12. Fuciarelli formed National Abstract in an attempt to remain in the title business after City Title's underwriter notified him that it was canceling the contract because City Title had too many claims. (*Id.*) Thereafter, Ticor agreed to serve as the underwriter for National, but insisted that Fuciarelli not have any ownership interest in National given his history of claims at City Title. (*Id.*) Consequently, ownership of National was transferred to Harris as sole owner, and Ticor became National's underwriter. (*Id.* at 3-4)

13. Fuciarelli had known Harris since the 1980s, and the two had worked together at other title insurance agencies including, as explained at the bench trial, a company called Minuteman Financial Open, and Genesis Title. Although Harris was never an owner or officer of City Title, he did have a relationship with it.

14. When National began operations in June 2005, City Title was winding up its operations with the same secretary, Suzanne Forget, serving both entities. (9/13/07 Order 4.) In addition to sharing secretarial services, National and City Title also shared the same office (within a building that Harris owned), had the same phone number and maintained escrow accounts at Lakeside Community Bank. (*Id.*) Further, National hired all of its employees from City Title, and Harris shared accounting responsibilities for City Title's Clinton Township branch. (*Id.*) Harris also performed closings for City Title and had check signing authority for City Title's escrow account. (*Id.*)

15. Pursuant to the Contract, National was required to keep safe and segregated in an escrow account all monies entrusted to it by Ticor or others in the course of its title issuing operations. (*Id.* at 5.) In that regard, National established an escrow account at Lakeside Community Bank in Sterling Heights, Michigan. (*Id.*)

16. On June 23, 2005, Forget received a telephone call from bank representative Kim Krzesenski, informing her that there was a shortage in City Title's escrow account. (*Id.*) Forget called Harris, who was already en route to the bank on a different matter. (*Id.*) Upon arrival at the bank, Harris spoke with Krzesenski, who confirmed that the City Title escrow account was short $269,575. (*Id.*) To remedy the shortage, Harris wrote two checks, one in the amount of $240,000, the other in the amount of $35,000, from National Abstract's escrow account payable to the bank, for the purpose of covering City Title's shortages. (*Id.*) After the checks were deposited into City Title's account, City's outstanding debts were paid, leaving it with a positive balance of $5,424.82. (*Id.*)

17. During the January 11, 2008 bench trial, Harris restated his contention that his employee, Suzanne Forget, received a call from the bank in which she was told that National Abstract's escrow had City Title's money in their escrow account.

18. Harris understood the requirements of the Contract as it related to maintaining a separate escrow account.

19. Harris was in charge of the accounting functions for National's escrow account and for reconciling the escrow account

20. Although Harris testified that he thought that funds had been mistakenly deposited into National's account, he did nothing to verify the state of affairs before transferring the money out of National's account into City Title's.

21. Harris went to the bank and wrote checks, purportedly based upon the bank's instructions, without first independently reconciling the account.

22. Harris admits that City Title was not entitled to "one red cent" of the $275,000 that was transferred.

23. Harris's conduct in responding to Ms. Forget's telephone call, even assuming that it occurred as described by Harris, was negligent in that he did not exercise due care in verifying the purported shortage before transferring the funds.

24. In early September 2005, approximately ten weeks after the transfer of funds, Harris notified Ticor that National's escrow account was missing funds. (9/13/07 Order at 6.)

25. On September 16, 2005, Ticor terminated its agreement with National, citing missing escrow funds. (*Id.* at 7.)

26. To date, the funds have not been returned. (*Id.*)

27. During the January 11, 2008 bench trial, the court heard testimony from Ethan Powsner, Great Lakes Agency Manager for Ticor.

28. Powsner has had significant experience, in various capacities, in the title insurance industry, and testified credibly on all subjects.

29. The court fully credits Powsner's testimony.

30. During the time period relevant to the issues in this litigation, Powsner was the Michigan Agency Manager for Ticor.

31. Powsner's responsibility over agents such as National included seeing that they were reporting their title insurance policies, paying the premiums and maintaining organized files.

32. Powsner's testimony gave further context to the actual course of conduct of the parties and other aspects of the relationship between National and Ticor which, in some circumstances, transcended the strict contours of the Contract.

33. For example, although the Contract states that National is not Ticor's agent with respect to closings, National necessarily performed closings in connection with its title insurance business. Harris, on this point, agreed.

34. Powsner referred to the universal use of "closing files" that include the title insurance documentation as well as any documentation relating to the settlement of a transaction.

35. Powsner explained that an issuing agent, like National, is an agent who does title research and prepares title commitments, which are documents explaining to the proposed insured parties what they need to do in order to get a title insurance

policy issued. Once those requirements are satisfied, the issuing agent will issue a title insurance policy.

36. The two most common types of title insurance policies are the owner's policy and the loan policy. An owner's policy ensures to the owner of the property that the title is as set forth in the policy, and that the owner has good title to the real estate. A loan policy ensures that a lender has the superior interest in the property so that if it needs to foreclose, it will be able to acquire good title to the property.

37. If, under a loan policy, an insured lender ultimately finds that it does not have the superior interest and first position against the insured property, the lender would file a claim against the underwriter, like Ticor, demanding that the underwriter pay the claim and defend the lender's interest.

38. Based on Powsner's interaction with National, it is clear that National did more than issue title insurance policies and commitments, and regularly conducted closings.

39. In the title insurance industry, agents who performed closings are referred to as closing agents, even though the consumer and the lender commonly refer to them as title agents.

40. A closing agent takes the title insurance commitment and assists in the gathering of the information necessary to satisfy the requirements of the title insurance commitment. Closing agents also take "lender's instructions" which are detailed written instructions from a lender, and, with the funds wired to the closing agent,

disburse the money pursuant to those written instructions from the lender as well as any specific instructions requirements in the title insurance commitment.

41. The issuing agent side of the business and the closing agent side of the business sometimes intersect.

42. Because there is a difference between closing and issuing a policy, lenders routinely ask for a "closing protection letter" to be issued on behalf of the underwriter. In a closing protection letter, the underwriter agrees to indemnify the lender for any problems that arise from the closing agent's failure to properly apply the funds, as set forth in the closing instructions, and the title insurance commitment.

43. If problems arise after the funds are distributed from the closing agent's conduct, the underwriter will receive a demand letter from the lender stating that there was a problem and demanding that the underwriter pay damages or otherwise indemnify the lender.

44. Further, if the title agent has not disbursed funds according to the closing instructions, there could be unresolved intervening liens or superior liens, which would prevent the lender from being placed in the first position.

45. Powsner testified that ¶ 4(G) of the Contract, detailing National's duties with respect to escrow accounts, was important to Ticor for two reasons: first, closing protection letters generally impose liability on Ticor for any misapplication of funds wired in from a bank from the lender and, second, a failure to properly disburse funds will generally lead to a title defect which would encumber the

lenders' first interest and implicate Ticor's title insurance commitment or policy liability.

46. Powsner testified that National was required to maintain an escrow account for money received from others because all the money that the title, or closing, agent receives is other peoples' money, which must be segregated and accounted for very carefully.

47. Consistent with ¶ 4(J) of the Contract, (*see* Fact # 7), Powsner explained how Ticor could be subject to allegations of liability if an agent such as National Abstract does not properly handle escrow funds.

48. First, the lender could request that Ticor defend a claim by informing Ticor that, under the terms of the closing protection letter and the title commitment, money for a transaction was not properly applied.

49. Second, separate liability could be triggered under the title insurance policy as to anything that was not covered, or paid for, under the provisions of the closing protection letter or the loan closing instructions.

50. Powsner was aware that claims were made against Ticor as a result of the escrow shortage at issue in this case.

51. Specifically, Ticor was requested by one or more lenders and other parties, to pay money to fix the problems.

52. Powsner also explained that ¶ 8 of the Contract is important because of Ticor's potential liability under the closing protection letter, as ¶ 8 generally describes what can go wrong in the distribution of funds by a closing agent.

53. Powsner explained that "settlement funds," as used under the Contract ¶ 7(H), is another name for escrow funds.

54. The escrow funds are deposited by the lender but a portion of the funds will be sent to Ticor for premiums.

55. The closing protection letter, which is not mentioned in the Contract, is an integral part of the title insurance business. Powsner estimated that 98 percent of all real estate transactions have a closing protection letter. Because the closing protection letter is involved in 98 percent of the transactions there is a connection between the escrow function and the title insurance function. A fiduciary duty necessarily arises as a result of the closing protection letter.

56. During the January 11, 2008 bench trial, the court heard testimony from Defendant Edward Thomas Harris.

57. Harris was, in general, not a credible witness; his demeanor, as well has his answers to several specific questions, was evasive and nonresponsive. As an example, when asked whether he investigated the status of the purportedly mis-applied funds, he evaded and did not answer, but on the repetition of the question –which focused upon any individual action he may have undertaken– he said "yes." When asked what he did to investigate, he said, evasively, "the best I could." When asked what "the best he could" amounted to in fact, he said that he "relied on the advice of others." When asked yet again whether he independently determined the true state of affairs, he finally conceded that he did not.

58. Harris confirmed his knowledge that the funds that were in National's escrow account were deposited by third party lenders, and did not belong to National or City Title.

59. The funds in the escrow were to be used in connection with real estate closings.

60. Harris testified that he understood that the closing aspect of National's business was separate and distinct from its agency relationship with Ticor. The court rejects this contention and instead accepts Mr. Powsner's assertion that the two aspects were intertwined.

61. Harris testified that National went into business just to issue title policies. He also admitted, however, that if National did not conduct real estate closings it could not issue policies.

62. There were two prongs to National's business, issuing policies and closing transactions. National necessarily came into existence in significant part to conduct real estate closings.

63. A fiduciary duty was owed to Ticor to properly handle and account for the escrow funds. The duty was not owed, as Harris contends, only to the people whose funds were in the escrow account.

64. Claims have been made against Ticor because those funds were not available for the closings to which they were made and Ticor has paid money to parties making claims.

### III. CONCLUSIONS OF LAW AND APPLICATION OF LAW TO THE FACTS

1. Michigan law recognizes the common-law relationship between a principal and its agent and the fiduciary duties arising from such a relationship. *Harts v. Farmer's*

*Insurance Exchange*, 597 N.W.2d 47, 50 (Mich. 1999); *Hawkeye Co. v. Frisbee*, 25 N.W.2d 521, 524-25 (Mich. 1947).

2. An agent is one who acts on behalf of another, particularly with regard to the conduct of business transactions. *Lincoln v. Fairfield-Nobel Co.,* 257 N.W.2d 148, 150 (Mich. Ct. App. 1977) (citing *Saums v. Parfet*, 258 N.W. 235 (Mich. 1935)).

3. An agency relationship can be established by contract. *Stratton-Cheeseman Management Co. v. Department of Treasury,* 407 N.W.2d 398, 401 (Mich. Ct. App. 1987) (citing *Ayer v. Devlin*, 146 N.W. 257 (Mich. 1914)). The manner in which the parties designate the relationship is not controlling. If an act done by one person on behalf of another is in its essential nature one of agency, then he is an agent regardless of the title bestowed upon him. *Lincoln v. Fairfield-Nobel Co.,* 257 N.W.2d 148, 151 (Mich. Ct. App. 1977) (citing *Van Pelt v. Paull*, 6 Mich.App. 618, 150 N.W.2d 185 (1967)); *see also Caldwell v. Cleveland-Cliffs Iron Co.,* 315 N.W.2d 186, 191 (Mich. Ct. App. 1981).

4. Whether an agent has negligently dealt with the affairs of the principal depends upon the agreement with the principal, since the agreement defines the scope of the agent's undertaking. *Mayer v. Auto-Owners Ins. Co.,* 338 N.W.2d 407, 409 (Mich. Ct. App. 1983) (citing 2 Restatement 2d, Agency, § 376, comment a, p. 173).

5. Michigan law provides that "[t]he primary goal in the construction or interpretation of any contract is to honor the intent of the parties." *Sault Ste. Marie Tribe of*

*Chippewa Indians v. Engler,* 146 F.3d 367, 372 (6th Cir. 1998) (citing *Rasheed v. Chrysler Corp.*, 445 Mich. 109, 517 N.W.2d 19, 29 n. 28 (1994)).

6. The existence and scope of the agency relationship is a question for the trier of fact. *Lincoln,* 257 N.W.2d at 151.

7. "Damages may be obtained for a breach of fiduciary duty when a 'position of influence has been acquired and abused, or when confidence has been reposed and betrayed.'" *In re Duane v. Baldwin Trust,* 733 N.W.2d 419, 427 (Mich. Ct. App. 2007) (quoting *Meyer & Anna Prentis Family Foundation, Inc. v. Barbara Ann Karmanos Cancer Institute*, 698 N.W.2d 900 (Mich. Ct. App. 2005)).

8. The Contract created an agency relationship between National and Ticor.

9. While Harris is technically not Ticor's agent under the terms of the Contract, Harris is nonetheless liable for National's obligations pursuant to the personal guarantee he signed.

10. Thus, Harris is liable under Ticor's breach of fiduciary duty count to the same extent that National is.

11. The Contract imposed various obligations on National pursuant to the agency relationship between National and Ticor.

12. Although National attempts to differentiate between contractual duties and fiduciary duties, the court finds that any duties owed by National under the contract were owed by National as an agent to Ticor as its principal and thus constitute fiduciary duties.

13. National also owed duties to Ticor, born out of the agency relationship, which may not have been specifically identified in the Contract.

14. "The agent is a fiduciary and owes to his principal the duty of good faith and loyalty. The agent is under the duty to use care, skill, and diligence, and to obey the instructions of his principal." *Burton v. Burton,* 51 N.W.2d 297, 302-03 (Mich.1952) (quotation and citation omitted); *Maxman v. Farmers Ins. Exchange,* 270 N.W.2d 534, 538 (Mich. Ct. App. 1978).

15. "[F]urther identifying characteristics of agency stem from the duties imposed upon the agent in his conduct of the principal's affairs. Fidelity to his principal is the essential basis of an agency." *Maxman,* 270 N.W.2d at 538 (citing *Horvath v. Langel*, 267 N.W. 865 (Mich. 1936).

16. "An agent has implied authority from his principal to do business in the principal's behalf in accordance with the general custom, usage and procedures in that business." *Meretta v. Peach,* 491 N.W.2d 278, 280 (Mich. Ct, App. 1992) (citations omitted).

17. Thus, even if National was not Ticor's agent with respect to conducting a closing, it nonetheless owed Ticor a fiduciary duty to properly handle any escrow funds.

18. This duty arises both from the terms of the Contract, (*see* Contract ¶¶ 4(G), 4(J) & 8(E)), and the general fiduciary duties owed to a principal of fidelity and loyalty and the duty to use care and skill in the performance of the agent's obligations.

19. A "person in a fiduciary relationship to another is under a duty to act for the benefit of the other with regard to matters within the scope of the relation." *Treadt v Lutheran Church Missouri Synod*, 603 N.W.2d 816, 823 (Mich. Ct. App. 1999).

20. The management of escrow funds was within the scope of the agency relationship between National and Ticor, and National thus breached its duty to act in Ticor's benefit when Harris improperly transferred the escrow funds.

21. Even if the limitation in ¶ 7(J) somehow precluded recovery under a breach of fiduciary duty theory, clear and convincing evidence was presented by Powsner establishing that the parties had modified this limitation through their course of conduct.

22. "[P]arties to a contract are free to mutually waive or modify their contract notwithstanding a written modification or anti-waiver clause because of the freedom to contract." *Quality Products and Concepts Co. v. Nagel Precision, Inc.*, 666 N.W.2d 251, 253 (Mich. 2003).

23. "This mutuality requirement is satisfied where a waiver or modification is established through clear and convincing evidence of a written agreement, oral agreement, or affirmative conduct establishing mutual agreement to modify or waive the particular original contract. In cases where a party relies on a course of conduct to establish waiver or modification, the law of waiver directs [the court's] inquiry and the significance of written modification and anti-waiver provisions regarding the parties' intent is increased." *Quality Products and Concepts Co. v. Nagel Precision, Inc.*, 666 N.W.2d 251, 253-54 (Mich. 2003).

24. Clear and convincing evidence was presented by Powsner establishing that because closings were such an integral part of National's business, National necessarily conducted closings within the scope of its agency relationship with Ticor.

25. "[A] fiduciary relationship arises from the reposing of faith, confidence, and trust and the reliance of one on the judgment and advice of another. Relief is granted when such position of influence has been acquired and abused, or when confidence has been reposed and betrayed." *Treadt*, 603 N.W.2d at 823 (citing *Vicencio v. Ramirez*, 536 N.W.2d 280 (Mich. Ct. App. 1995))

26. Because National abused its position with Ticor and betrayed Ticor's confidence in it, relief is appropriate.

27. Ticor is liable to third parties as a result of National's mishandling of escrowed funds.

28. When Harris transferred the funds, National breached its fiduciary duties to Ticor, causing Ticor $275,000 in damages, the full amount of the transferred funds.

29. Ticor's exposure is also in the full amount of the transferred funds.

30. National is therefore liable in the amount of $275,000 on Ticor's breach of fiduciary duty claim.

31. Through operation of the personal guarantee, Harris is also liable to Ticor in the amout of $275,000 on Ticor's breach of fiduciary duty claim.

### IV. CONCLUSION

Judgment will be awarded in favor of Ticor and against National and Harris on Ticor's breach of fiduciary duty count. A judgment will issue after the resolution of this entire case.

The court will conduct a telephone conference on **May 29, 2008 at 10:30 a.m.** to determine the appropriate manner in which this action should proceed to conclusion.

        s/Robert H. Cleland
        ROBERT H. CLELAND
        UNITED STATES DISTRICT JUDGE

Dated: May 22, 2008

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, May 22, 2008, by electronic and/or ordinary mail.

        s/Lisa G. Wagner
        Case Manager and Deputy Clerk
        (313) 234-5522